

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-25-00675-CV

**IN THE INTEREST OF J.C.B.G.**, et al., Children

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2023-PA-01753
Honorable Charles E. Montemayor, Judge Presiding

Opinion by:    H. Todd McCray, Justice

Sitting:    Irene Rios, Justice
Lori Massey Brissette, Justice
H. Todd McCray, Justice

Delivered and Filed: June 17, 2025

AFFIRMED

Appellant T.H. ("Mother") appeals the termination of her parental rights to six of her children, J.C.B.G., K.A.C., K.L.H., A.S.R., F.D.R., and J.A.H.[1] Mother challenges the legal and factual sufficiency of the evidence supporting the trial court's findings under Texas Family Code § 161.001(b)(1)(D) and (E), as well as the trial court's finding that termination was in the children's best interests. We affirm the termination order.

---

[1] To protect the identity of minor children in an appeal from an order terminating parental rights, we refer to appellant as "Mother" and to the children by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

**BACKGROUND**

The Department became involved with the family based on numerous past allegations of abuse, neglectful supervision, and physical neglect. The case ultimately centered on serious injuries sustained by the youngest child, J.A.H. At the time of removal, the children ranged in age from approximately nine months to eleven years old. All six children were removed from Mother's care and placed with their maternal grandmother, where they have remained throughout the case. After a bench trial and a de novo hearing, the trial court found clear and convincing evidence to support termination of Mother's parental rights under subsections 161.001(1)(D), (E), (N), and (O) of the Texas Family Code, and that termination was in the best interest of the children. The Department was appointed as permanent managing conservator of the children.

**ANALYSIS**

**A. Applicable Law and Standard of Review**

Involuntary termination of parental rights requires the Department to prove both that the parent committed a predicate act under subsection 161.001(b)(1) of the Family Code and that termination is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b). Given the profound consequences of terminating a parent's rights to her child, the Department must prove both elements by clear and convincing evidence. *See* TEX. FAM. CODE ANN. § 161.206(a); *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). Clear and convincing evidence is the degree of proof that will produce in the factfinder a firm belief or conviction as to the truth of the allegations. *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (citing TEX. FAM. CODE ANN. § 101.007). This heightened standard of proof necessarily extends to appellate review in such cases. *A.C.*, 560 S.W.3d at 630–31; *In re G.M.M.*, 721 S.W.3d 679, 683 (Tex. App.—San Antonio 2025, no pet.).

When reviewing the sufficiency of the evidence supporting a trial court's order of termination, we apply well-established standards of review. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). In reviewing the legal sufficiency of the evidence to support the trial court's findings, we review all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that the finding was true. *A.C.*, 560 S.W.3d at 630–31. In comparison, when reviewing the factual sufficiency of the evidence, we consider and weigh all of the evidence, including disputed or conflicting evidence, to determine whether the evidence that is contrary to a finding would prevent a reasonable factfinder from forming a firm belief or conviction that the finding is true. *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). We give due deference to the fact finder's determinations, remembering that the factfinder is the sole judge of the weight and credibility of the evidence. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

### B. Statutory Termination Grounds

#### 1. Texas Family Code section 161.001(b)(1)(D) and (E)

Mother's parental rights were terminated pursuant to subsections (D), (E), (N), and (O) of section 161.001(b)(1) of the Texas Family Code. However, Mother challenges only the trial court's findings under subsections (D) and (E). Because only one predicate violation under section 161.001(b)(1) is necessary to support a termination order, regardless of the evidentiary support for termination under Subsections (D) and (E), we must affirm the judgment on the unchallenged grounds. *See N.G.*, 577 S.W.3d at 232 (Tex. 2019); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We must nevertheless analyze Mother's issues relating to the sufficiency of the evidence to support the trial court's findings under subsections (D) and (E) because termination under those subsections may serve as the basis for a termination of Mother's parental rights to other children in the future. *See In re R.R.A.*, 687 S.W.3d 269, 279 (Tex. 2024); *N.G.*, 577 S.W.3d at 234.

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent knowingly placed or knowingly allowed the child to remain in conditions or surroundings that endangered the child's physical or emotional well-being or engaged in conduct or knowingly placed the child with persons who engaged in conduct that endangered the child's physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). "Endanger" means to expose a child to loss or injury or to jeopardize the child's emotional or physical well-being. *Boyd v. Tex. Dep't of Human Servs.*, 727 S.W.2d 531, 533 (Tex. 1987). Endangering conduct need not be directed at the child, and the child need not actually suffer injury. *In re N.K.*, 399 S.W.3d 322, 330–31 (Tex. App.—Amarillo 2013, no pet.).

Although both subsections focus on endangerment, they differ in the source of the danger to the child. *In re R.D.*, 955 S.W.2d 364, 367 (Tex. App.–San Antonio 1997, pet. ref'd.). Subsection (D) concerns the child's environment and living conditions. *In re A.A.L.A.*, No. 14-15-00265-CV, 2015 WL 5437100, at *5 (Tex. App.—Houston [14th Dist.] Sept. 15, 2015, no pet.) (mem. op.). Under subsection (D), a single pre-removal act, omission, or incident can support termination. *In re A.D.M.*, No. 04-25-00043-CV, 2025 WL 1703745, at *3 (Tex. App.—San Antonio June 18, 2025, pet. denied) (mem. op.) (quoting *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *9 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.)).

By contrast, subsection (E) focuses on the parent's conduct, including acts, omissions, and failures to act that create a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *In re M.J.M.L.*, 31 S.W.3d 347, 350–51 (Tex. App.—San Antonio 2000, pet. denied). Because subsection (E) focuses on a parent's course of conduct, the relevant inquiry may encompass parental conduct occurring outside the child's presence or after the child's removal. *In*

*re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at \*4–5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.).

In challenging the legal and factual sufficiency of the evidence supporting the trial court's endangerment findings under subsections (D) and (E), Mother emphasizes her participation in services, counseling, visitation, and her lack of drug use. Although the record contains some evidence supporting those assertions, the trial court was not required to credit that evidence over contrary evidence regarding the children's living conditions, Mother's inadequate supervision, and her conduct both prior to and after their removal. *See J.O.A.,* 283 S.W.3d at 346 (recognizing factfinder as sole judge of credibility and weight of evidence). Viewing the evidence in light of the applicable standards of review, we conclude the record supports the trial court's findings under both subsections. Because the evidence pertaining to subsections (D) and (E) is interrelated, we review it together. *See In re H.M.L.*, No. 07-25-00092-CV, 2025 WL 2167259, at \*5 (Tex. App.—Amarillo July 30, 2025, pet. denied) (mem. op.).

### 2. Longstanding Instability and Unsafe Supervision

The evidence reflects that the children's living environment prior to removal was marked by longstanding instability and inadequate supervision. The Department has been involved with the family on approximately sixteen prior occasions, including investigations involving physical abuse, sexual abuse, neglectful supervision, and incidents in which F.D.R., an autistic toddler, left the home without supervision while Mother remained unaware the child was missing. On at least one previous occasion, the children were removed from Mother's care and placed with their grandmother. The trial court could reasonably consider this history in evaluating the safety of the children's surroundings. *See In re J.H.*, No. 01-25-00854-CV, 2026 WL 968923, at \*21 (Tex. App.—Houston [1st Dist.] Apr. 10, 2026, no pet. h.) (mem. op.) (considering history with the

Department in evaluating evidence of endangerment); *In re T.B.*, No. 09-20-00172-CV, 2020 WL 6787523, at *8 (Tex. App.—Beaumont Nov. 19, 2020, no pet.) (mem. op.) (noting "factfinder may consider prior CPS history of neglect, drug use, or lack of care for the children when making a finding of endangerment"); *In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.) (factfinder may infer future conduct from parent's past conduct).

Consistent with that history, the evidence showed the children were exposed to unsafe conditions in the home. Testimony reflected that the children were often unsupervised or that the youngest children were left in the care of the older children. They were exposed to domestic violence, adult situations, and individuals not appropriate for their age. This resulted in inappropriate acting out, boundary issues, reduced social skills, stress, anxiety, and self-esteem issues in the children. The evidence further reflected concerns regarding transportation safety, including reports that children repeatedly rode unrestrained in vehicles. The court heard testimony regarding an automobile accident in which unrestrained children were injured, after which Mother did not obtain appropriate medical care for them.

The trial court could reasonably infer from this evidence that the children's environment exposed them to danger that Mother consciously disregarded. *See In re M.C.*, 917 S.W.2d 268, 269-70 (Tex. 1996) (determining that children left without competent adult supervision were endangered); *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *10–11 (Tex. App.—Fort Worth Apr. 28, 2022, pet. denied) (mem. op.) (finding parent's failure to supervise her child created dangerous condition for child); *In re M.H.*, No. 06-22-00072-CV, 2023 WL 2711127, at *5 (Tex. App.—Texarkana Mar. 30, 2023, pet. denied) (mem. op.) (considering mother's operation of motor vehicle with child unrestrained to be endangering conduct); *Interest of I.F.*, No. 01-22-00375-CV, 2022 WL 16640627, at *5 (Tex. App.—Houston [1st Dist.] Nov. 3, 2022, no pet.)

(mem. op.) (finding that leaving young children alone and without supervision contributed to endangering environment).

### 3. J.A.H.'s Injuries and Mother's Response

The evidence reflected that the pattern of endangerment ultimately culminated in the most serious incident in the record. J.A.H., an infant, sustained mixed second and third degree burns to both legs while in Mother's care, requiring two months of hospitalization, multiple surgeries, skin grafting, and extensive therapy. According to Mother, this injury occurred while she was in the kitchen cooking and one of the younger children put a hairdryer underneath the baby's blanket. *See In In re A.H.*, No. 04-15-00416-CV, 2015 WL 7565569, at \*6 (Tex. App.—San Antonio Nov. 25, 2015, no pet.) (mem. op.) (holding young children left unsupervised on an adult bed where severe injury occurred suggests parental failure to protect children from danger); *In re J.P.,* No. 02–12–00121–CV, 2012 WL 5949492, at \*10 (Tex .App.–Fort Worth Nov. 29, 2012, no pet.) (mem. op.) (involving child suffering tibia fracture as result of being left unsupervised on a bed).

J.A.H.'s treating physical therapist testified that J.A.H. developed contractures requiring ongoing stretching, splinting, positioning, and scar management and that his injuries resulted in permanent scarring with possible long-term mobility limitations. Other testimony established that J.A.H. suffered significant pain during treatment and ultimately faces more therapy and surgery related to his injuries as he grows, including the potential amputation of a toe.

The trial court also heard testimony that Mother was not present during most of J.A.H.'s hospitalization, did not attend his surgeries, did not participate in therapy, and did not receive or implement instructions necessary for his recovery and ongoing care. Mother's own testimony indicated a lack of knowledge regarding J.A.H.'s condition and treatment.

Based on this evidence, the trial court could reasonably consider whether the same lack of supervision and inadequate caregiver involvement that led to the injury remained unremedied, even in the face of such a tragic event. *See In re K.S.O.B.,* No. 01-18-00860-CV, 2019 WL 1246348, at *19 (Tex. App.—Houston [1st Dist.] Mar. 19, 2019, no pet.) (mem. op.) (noting trier of fact can infer from parent's past inattention to child's medical needs that such inattention will continue in future); *In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *4 (Tex. App.— Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.) (considering evidence that parents failed to show appropriate concern for or adequately manage child's extensive medical needs); *In re S.R.*, No. 02-11-00153-CV, 2012 WL 4465153, at *11 (Tex. App.—Fort Worth Sept. 27, 2012, no pet.) (mem. op. on reh'g) (considering evidence that parent did not regularly visit hospitalized child and failed to obtain training necessary to care for the child's extensive medical needs).

The evidence further showed that, after review of medical records and forensic interviews, investigators referred the incident to the district attorney. A detective testified that the case had been accepted and could be pending indictment. The trial court could consider this evidence in evaluating the seriousness of the conditions in which the child was injured and reasonably infer that a home environment in which a child sustains injuries of this severity is not safe.

### 4. Mother's Conduct During the Pendency of the Case

#### a. Failure to Accept Responsibility

The evidence further showed that Mother did not meaningfully address the supervision concerns and unsafe decision-making that culminated in J.A.H.'s injuries. Although the Department had extensive prior involvement with the family regarding neglectful supervision concerns, Mother did not consistently accept responsibility for the circumstances leading to J.A.H.'s injuries and at times blamed others, including the children themselves. There was

testimony that Mother sought therapy for PTSD surrounding the incident, focusing the aftermath of the incident on herself rather than on her injured child. Although Mother's therapist testified she was making progress and had recently begun to acknowledge responsibility during counseling, the therapist had only seen Mother six times and acknowledged that Mother continued to externalize blame. The trial court could reasonably infer from this evidence that Mother had not fully addressed the conduct that endangered the children. *See In re L.C.*, 145 S.W.3d 790, 800 (Tex. App.—Texarkana 2004, no pet.) (noting mother's blame shifting demonstrated mother's failure to take responsibility and would likely prevent improved parenting).

### b. Sporadic Visitation with Children

Mother's conduct toward the children during the pendency of the case further reflected instability and inconsistency. Mother missed a substantial number of scheduled visits with the children, and there were extended periods in which she attended none. The children's therapist testified that when Mother did visit with the children, the visits caused confusion, anger, and grief. Several witnesses testified the children experienced emotional distress, disappointment, and behavioral regression when Mother promised visits, reunification, gifts, or changed circumstances that did not occur. The attorney ad litem for the children ultimately petitioned the court to allow visits to stop because the inconsistency and emotional fallout were negatively affecting the children.

Both the children's therapist and the Department caseworker testified that, since they have been involved with Mother, there is no indication that Mother has adequately addressed the issues in this case. The therapist explained that while Mother loves the children, she fixates on herself and does not have the capacity for high level, responsible parenting. *See In re T.J.*, No. 05-23-00074-CV; 2023 WL 4008687, at *5-7 (Tex. App.—Fort Worth June 15, 2023, pet. denied) (mem.

op.) (holding that mother's failure to cooperate with the Department in order to preserve a relationship with her children supported endangerment finding); *In re J.G.*, No. 02-21-00257-CV, 2022 WL 187983, at \*9 (Tex. App.—Fort Worth Jan. 20, 2022, no pet.) (mem. op.) (stating parent's failure to visit can endanger child's emotional well-being and supports finding of endangerment).

### c. Interference with Placement

The evidence also showed Mother engaged in conduct that destabilized the children's placement with Grandmother. The trial court heard evidence that Mother threatened to take the children out of temporary custody, disparaged Grandmother in front of the children and consistently undermined Grandmother's authority with the children. Testimony reflected Mother falsely reported allegations that Grandmother's boyfriend sexually abused one of the children. All of this behavior caused confusion and turmoil to the children. The trial court could reasonably consider whether Mother's behavior disrupted the stability of the children's placement and interfered with their care. S*ee In re E.S.S.*, No. 05-23-00031-CV, 2023 WL 4782682, at \*10 (Tex. App.—Dallas July 27, 2023, pet. denied) (mem. op.) (considering inappropriate attempts to interfere with child's placement in finding endangerment).

### d. Housing Instability

The record further showed a history of housing instability stretching back to when the oldest child was a baby. During the pendency of this case, Mother chose to move to California, limiting her ability to consistently visit the children and participate in her service plan. Testimony reflected concerns regarding Mother's housing stability during portions of that time, including a sustained period of homelessness and difficulties verifying her reported residence.

Although Mother eventually moved back to Texas and obtained an apartment, there was also evidence that Mother cancelled or obstructed attempts to inspect the home and failed to cooperate in arranging alternative visits. In spite of moving back to Texas, Mother chose to relocate four hours away from the children. This resulted in more missed visits due to unreliable transportation. The record further reflects that, at the time of the de novo hearing, Mother had been evicted from the Texas apartment and had again moved to California.

In general, parental conduct that exposes children to a life of uncertainty and instability endangers the physical and emotional well-being of those children. *J.O.A.*, 283 S.W.3d at 345 n.4. Accordingly, the trial court could reasonably consider this evidence of instability in determining whether Mother is capable of providing the children with a stable home environment and was appropriately engaged in reunifying the family over the course of these proceedings. *See In re M.G.*, No. 02-23-00074-CV, 2023 WL 4008687, at *8 (Tex. App.—Fort Worth June 15, 2023, pet. denied) (mem. op.) (considering evidence that Mother failed to secure stable housing, did not fully cooperate with the Department, and did not comply with her service plan); *In re J.H.*, No. 07-21-00059-CV, 2021 WL 2693284, at *3 (Tex. App.—Amarillo June 30, 2021, pet. denied) (mem. op.) (noting parent's erratic work and residential history revealed she was unable to provide children with stable home).

### e. Credibility

The trial court was additionally entitled to consider Mother's credibility. At the bench trial, in spite of telling her mother, the children and her counselor that she was going to have twins, Mother denied being pregnant and testified she had miscarried. At the later de novo hearing, however, she admitted that her previous testimony was false and acknowledged she had given birth to twins in May 2025. The trial court, as sole judge of credibility, could reasonably consider Mother's

admitted false testimony in evaluating the reliability of her other representations concerning her stability, parenting, and ability to safely care for the children. *See In re L. M. M.*, 522 S.W.3d 34, 45 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (noting mother's credibility was called into doubt where she admitted she had lied to investigators and falsely denied being pregnant).

The evidence further showed that, during the pendency of this case, a new Department investigation was opened in Tyler regarding physical abuse to the newborn twins, and that Mother again chose to relocate to California while the case remained pending. The trial court could reasonably consider whether these decisions reflected priorities inconsistent with her children's need for stability. *See In re M.B.*, No. 14-25-00418-CV, 2025 WL 3275376, at *10 (Tex. App.—Houston [14th Dist.] Nov. 25, 2025, no pet.) (explaining that past conduct may create an inference that the same conduct may recur and further jeopardize the child's physical or emotional well-being).

Viewed as a whole, the evidence shows not just isolated mistakes or lapses in judgment, but dangerous conditions at the time of removal, including longstanding supervision concerns, repeated Department involvement, and severe injury to a child. The evidence reveals a continuing course of conduct characterized by inconsistent caregiving, refusal to accept responsibility, emotional disruption to the children, housing instability, lack of truthfulness, and conduct undermining the children's placement and well-being.

Considering this evidence in the light most favorable to the judgment and disregarding all evidence that a reasonable factfinder could have disbelieved or found incredible, we conclude that the evidence would enable a factfinder to form a firm belief or conviction that Mother knowingly placed or knowingly allowed her children to remain in conditions or surroundings which endangered their physical or emotional well-being and that she likewise engaged in a course of

conduct that endangered their well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). Furthermore, the evidence contrary to the trial court's findings is not so overwhelming that it would prevent a reasonable factfinder from forming a firm belief or conviction that such a finding is true. The evidence is therefore both legally and factually sufficient to support the trial court's predicate finding under subsections (D) and (E).

## C. Best Interest Finding

When considering the best interest of a child in the context of involuntary parental termination, a strong presumption favors preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). At the same time, the Texas Family Code presumes that prompt and permanent placement of the child in a safe environment is in a child's best interest. TEX. FAM. CODE ANN. § 263.307(a). The Department must rebut the first presumption and satisfy the second with clear and convincing evidence. *In re E.J.M.*, 673 S.W.3d 310, 332 (Tex. App.—San Antonio 2023, no pet.).

Courts evaluate best interest using a non-exclusive list of statutory factors.[2] TEX. FAM. CODE ANN. § 263.307(b). The Texas Supreme Court has also provided a similar framework[3] to consider

---

[2] These factors include: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child [or] the child's parents; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills... ; and (13) whether an adequate social support system ... is available to the child. TEX. FAM. CODE ANN. § 263.307(b).

[3] These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist the individuals seeking custody to promote the child's best interest; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions which may indicate that the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *Holley*, 544 S.W.2d at 371–72; *see also In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013).

in determining a child's best interest. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). Neither the statutory factors nor the *Holley* factors are exhaustive, and "[e]vidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied) (mem. op.).

When evaluating a child's best interest, courts may consider circumstantial evidence, subjective factors, and the totality of the evidence. *In re B.R.*, 456 S.W.3d 612, 615 (Tex. App.—San Antonio 2015, no pet.); *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). Conduct supporting a statutory ground for termination is probative of best interest, and the factfinder may measure a parent's future ability to meet a child's needs by past conduct. *In re C.H.*, 89 S.W.3d 17, 28 Tex. (2002); *E.D.*, 419 S.W.3d at 620. Ultimately, the focus must remain on the child's best interest, not the interest of the parent. *In re J.E.F.*, No. 04-26-00086-CV, 2026 WL 1326514, at *5 (Tex. App.—San Antonio May 13, 2026, no pet. h.) (mem. op.) (citing *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ)).

In challenging the trial court's finding that termination of her parental rights is in the children's best interest, Mother points to evidence that she participated in some services, maintained a bond with the children, obtained housing, and demonstrated some progress. While the record contains evidence supporting those assertions, the trial court was entitled to weigh that evidence against the children's needs and the evidence of their current circumstances. *In re L.R.R.*, No. 04-22-00357-CV, 2022 WL 17480439, at *2 (Tex. App.—San Antonio Dec. 7, 2022, pet. denied) (mem. op.).

The most compelling evidence supporting the trial court's best interest finding concerns the children's conditions before and after placement. The record reflects that, prior to removal,

several of the children were significantly behind in school, had significant absences, and were struggling academically, emotionally, and behaviorally. After placement with Grandmother, the evidence showed significant and consistent improvement across all of the children.

Testimony established that the children were enrolled in school, attending regularly, and performing well academically. Witnesses described the children as thriving academically, socially, and within their family environment. The evidence further showed that this improvement was the result of consistent structure and active caregiving. Grandmother worked with the children daily, including teaching them to read, using flashcards, and ensuring consistent school attendance and engagement. She also obtained appropriate medical care and services for them as needed.

Child-specific evidence reinforced this progress. All the children who had previously struggled academically are now performing at or above grade level. K.L.H., who is dyslexic and previously wrote letters backward, is now writing correctly and succeeding academically. F.D.R., who has autism and previously exhibited significant behavioral challenges, became more focused, more engaged in school, and developed important self-care skills, including independent hygiene. There was testimony that the difference in F.D.R. is "night and day" since being with Grandmother. Further, J.A.H.'s medical needs are being met and he is now walking and able to go to daycare in spite of his burn injuries.

Witnesses consistently described the placement as stable and appropriate. The children are bonded with their grandmother, feel safe and nurtured, and are improving in behavior, boundaries, and social functioning. Grandmother testified that she would like to permanently adopt the children. *See In re H.F.F.*, No. 04-25-00458-CV, 2025 WL 3716156, at *7 (Tex. App.—San Antonio Dec. 23, 2025, pet. denied) (mem. op.) (noting child's need for certainty, permanence, and stable home is principal consideration in best interest decision).

The trial court could reasonably compare these circumstances with Mother's conduct discussed above in our analysis under subsections (D) and (E). See *In re J.C.H-P.*, No. 04-23-00636-CV, 2023 WL 7006285, at *2 (Tex. App.—San Antonio Oct. 25, 2023, pet. denied) (mem. op.) (explaining that evidence proving statutory ground for termination is probative on the issue of best interest). The evidence showed a pattern of instability, inconsistent supervision, exposure to dangerous environments, and failure to consistently meet the children's needs. The evidence further indicates that Mother failed to cooperate with caseworkers and missed visits, causing emotional harm to the children. The trial court could also consider Mother's admitted lack of candor and disruption to the children's lives. All of this evidence bears directly on the best interest factors concerning the children's need for safety, stability, and consistent caregiving. *See* TEX. FAM. CODE ANN. § 263.307(b)(1), (3), (4), (6), (10), (11), (12); *Holley*, 544 S.W.2d at 371–72 (relevant to factors 2, 3, 4. 5. 8, and 9).

Additionally, the record reflects that J.A.H. will require continued medical treatment and support in the future and that F.D.R. requires significant autism-specific supervision and care. Under these circumstances, the trial court could reasonably consider whether Mother demonstrated the ability and willingness to consistently meet the demands of caring for medically and developmentally vulnerable children. *See In re A.C.*, No. 05-25-00597-CV, 2025 WL 3164671, at *8 (Tex. App.—Dallas Nov. 12, 2025, no pet.) (mem. op.) (identifying child's fragile medical condition, mother's lack of understanding of his medical needs, history of chronic neglect, her failure to take any responsibility, lack of insight, and failure to change despite years of service as evidence supporting best interest finding).

Contrasting the children's demonstrated improvement in a stable placement and their need for consistency, care, and supervision with what were described as the traumatic and chaotic

conditions they experienced with Mother, the trial court could reasonably form a firm belief or conviction that termination of Mother's parental rights is in the children's best interest. Any evidence to the contrary is not so overwhelming that it would prevent a reasonable factfinder from forming such a conviction. The evidence is therefore both legally and factually sufficient to support the trial court's best interest finding.

The order of termination is affirmed.

H. Todd McCray, Justice